UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NICHOLAS VONTZ,

       Plaintiff,

v.

DALE MALONE, in his personal and
official capacity, MICHAEL MITCHEFF,
JANIE JACKSON, STEPHANIE DENEAU,
RACHEL BRUNER, ASHLEY WELLMAN,
and JOSHUA HOTALING, in their personal
capacities,

       Defendants.

_____/

Case No. 2:19-cv-12735
District Judge Terrence G. Berg
Magistrate Judge Kimberly G. Altman

## REPORT AND RECOMMENDATION ON
## RACHEL BRUNER, JAMIE JACKSON, MICHAEL MITCHEFF,  STEPHANIE RUSSEAU, AND ASHLEY WELLMAN'S MOTION FOR SUMMARY JUDGMENT (ECF No. 74)
## AND
## DALE MALONE'S MOTION FOR JUDMENT ON THE PLEADINGS AND/OR SUMMARY JUDGMENT (ECF. No. 75)

I.     Introduction

This is a prisoner civil rights case under 42 U.S.C. § 1983.  Plaintiff

Nicholas Vontz, proceeding *pro se*, filed a complaint alleging that during his

approximately eight month confinement at the Monroe County Jail as a pretrial

detainee, defendants violated his constitutional rights.  All pretrial matters were

referred to the undersigned.  (ECF No. 18).  Before the Court is defendants Rachel

Bruner, Jamie Jackson, Michael Mitcheff, Stephanie Russeau, and Ashley

Wellman's Motion for Summary Judgment (ECF No. 74), and Dale Malone's

Motion for Judgment on the Pleadings and/or Summary Judgment (ECF. No. 75).[1]

For the reasons that follow, the undersigned RECOMMENDS that the

motions be GRANTED and Vontz's claims against them be DISMISSED WITH

PREJUDICE.

## II.      Background

### A.     Vontz's Complaint

 In his most recent amended complaint, filed on December 15, 2021, Vontz

makes the following allegations:[2]

On February 5, 2018, Vontz was arrested "and transferred to [Monroe

County Jail] after a failed suicide attempt."  (ECF No. 86, PageID.1692).  He was

housed in an observational cell on suicide prevention until February 7, 2018, after

posting bond.  (*Id*.).  Because the sliding cell door had a three or four inch gap at

_____

[1] Bruner, Jackson, and Russeau are licensed practical nurses, Mitcheff is a doctor
and Wellman is a registered nurse (collectively the "Medical Defendants").
Malone was the Monroe County Sheriff.
[2] Vontz filed multiple amendments to the original September 19, 2019 complaint.
His allegations as considered here, are drawn exclusively from the most recent,
December 15, 2021 complaint.  *See In re Refrigerant Compressors Antitrust Litig.*,
731 F.3d 586, 589 (6th Cir. 2013) ("An amended complaint supersedes an earlier
complaint for all purposes.").

the bottom, and was close to the intake garage, there was a "constant and direct flow of freezing cold air" that entered the cell.  (*Id*.).  Vontz was denied a mattress, but given a suicide gown and a five-foot square suicide blanket.  He states that he was forced to sleep on a bare concrete floor during his two days in the observational cell.  (*Id*.).

Between February 22 and March 8, 2018 while he was on bond, Vontz sought mental health services from Western Wayne Community Health Center, where Dr. Alireza Amirsadri prescribed 15 mg of the anti-depressant Remeron daily to treat anxiety.  (*Id*., PageID.1693).  Vontz was re-arrested on March 9, 2018, and returned to the Monroe County Jail.  He was again placed on a suicide watch "after having suffered a severe anxiety attack."  He adds that "[a]t no time did [he] communicate suicidal thoughts, only acute severe anxiety."  (*Id*).  He states that for three days he was "forced to lay on a bare concrete floor in temperatures low enough to see his breath, exacerbating the pain from his arthritic joints."  (*Id*.).

Between March 9 and March 12, 2018, Vontz "made numerous requests" to Jackson and Deneau to speak to mental health providers, but these two defendants "refused to acknowledge" him.  (*Id*., PageID.1693-1694).  On March 12, he began his Remeron medication, 15 mg. once daily.  (*Id*., PageID.1694).  On or about March 17, his Remeron prescription was increased to 30 mg. twice daily.  He

alleges "on information and belief" that Dr. Mitcheff authorized the increase without consulting him, and that the dosage exceeded the amount "allowed by F.D.A. restrictions." (*Id*.).

Between March 12 and November 7, 2018, Vontz made "numerous verbal requests" to defendants Jackson, Deneau, Bruner, and Wellman to see mental health staff. He states that "[f]rom the record it is apparent that those requests went ignored." (*Id*.). Within two weeks of the increase in the Remeron prescription, Vontz suffered "increased anxiety, depression, mania, memory loss/confusion, delirium, and impaired thinking." (*Id*., PageID.1695).[3] He made "numerous attempts" to speak to mental health providers concerning the side-effects, but those requests were ignored. (*Id*.).

Vontz claims that Jackson, Bruner, Deneau, and Wellman failed to ensure that he "received timely and competent mental health care." He claims that Malone "failed to adopt and implement adequate polices" concerning proper mental health care and treatment. (*Id*., PageID.1695-1696).

## B.    Vontz's Deposition

At his deposition, Vontz testified that he was in the Monroe County Jail from March 9 to November 7, 2018. (ECF No. 75-2, PageID.1142). At the time

---

[3] Vontz refers to an "expert witness statement" attached as Exhibit D. (*Id*). However, there are no exhibits attached to the most recent amended complaint.

he was arrested, he did not suffer from any medical problems, but he had mental or emotional problems of "low complexity decision making, severe anxiety, manic depression, [and] suicidal thoughts." (*Id.*, PageID.1143). He attempted suicide on February 5, 2018. (*Id.*). He testified that he had also attempted suicide in 2003 or 2004. (*Id.*). In February of 2018, Western Wayne Community Health prescribed him 15 mg of Remeron, stating that they would adjust the dosage after 30 days. However, he had only been taking it about a week and a half when he was re-arrested. (*Id.*, PageID.1145). Following his initial arrest of February 5, 2018, he was on suicide watch in the Monroe County Jail for two days before he was released on bond. During these two days he was not given prescriptions for any medications. (*Id.*, PageID.1152).

Vontz further testified that the observation cell in which he was placed while he was on suicide watch was "brutally cold," and that he had no mattress, but he did not require any medical treatment as a result. (*Id.*). He was provided with food. (*Id.*).

Vontz testified that his complaint is that his "complaints went ignored by both mental health and medical after the initial intake." (*Id*) He testified that the two policies that form the basis of his suit against the Monroe County Sheriff are the mental health policy and the suicide policy. (*Id.*, PageID.1155).

Regarding his damages from the increased dose of Remeron, Vontz testified as follows:

Q:   Let's just pin that down.  First off, no physical injuries?

A:   No.

Q:   Just mental?

A:   Mental and emotional.  (*Id*., PageID.1161).

\*                                        \*                                        \*

Q:   Just to round up, I want to make sure I didn't miss anything. The damages you are alleging here are the mental and emotional trauma during March 2018 through November 2018—

A:  Correct.

(*Id*.).

Regarding his time on suicide watch, he testified that there was "pain and discomfort from the sleeping on the floor in the cold, but that's not the main focus of the action." (*Id*.).  He did not get frostbite or require any medical treatment. There were no physical injuries.  (*Id*.).

Vontz also testified that within a day of being returned to the Monroe County Jail on March 9, 2018, he was seen by medical personnel.  He was having a panic attack at that time and was given Tylenol.  (*Id*., PageID.1177).  He was seen again the following day, at which time Vontz advised that he had been taking Remeron and that he had previous suicide attempts.  (*Id*.).  He also advised that he

6

had been without Remeron for a day.  (*Id*).  Vontz testified that he spoke twice to Joshua Hotaling[4] at the jail.  He told Hotaling that he was having panic attacks or anxiety attacks, and that he was having trouble sleeping.  (*Id*., PageID.1178).[5] Vontz saw medical staff again on May 3 or 4, 2018 after complaining of headaches.  (*Id*.).  He testified that he never had any issues regarding his medical care, and that his complaint is that the defendants took no action with respect to "[t]he mental health aspect."  He stated, "No, I have not made any allegations as to the medical part, strictly the mental health aspect."  (*Id*., PageID.1180).

Vontz testified that Jackson violated his constitutional rights by failing to relay Vontz's symptoms to medical staff.  Vontz bases this belief on the absence of any notation in the record.  (*Id*., PageID.1181).  He testified that his claims against Jackson, Deneau, Bruner, and Wellman were based on his telling them that he wanted to see a mental health provider, and these defendants telling him that he needed to "kite" mental health.  (*Id*., PageID.1182).  He testified that his belief that

---

[4] Vontz also sued "unknown Joshua" who was later identified as Joshua Hotaling. Hotaling has answered the amended complaint and is not a party to the instant motions.

[5] Vontz disputed the medical records indicating that he saw Hotaling on March 13, 2018, stating instead that he did not see Hotaling until "mid-March, April, something like that."  (*Id*., PageID.1178-1179).  Vontz  further said that he "retracted" the statement in his complaint that he met with Hotaling on March 13. (*Id*., PageID.1179).

these defendants did not notify mental health providers is based on the lack of documentation, which he said would be "standard practice." (*Id.*, PageID.1183).

C.     Medical Records

Intake notes indicate that when Vontz was admitted to the jail on February 5, 2018, he was upset and crying, and stated that he had attempted to hurt himself. (ECF No. 74-3, PageID.1006).  He was placed on a 15-minute check until he could be seen by Mental Health.  (*Id.*, PageID.1007).  On March 9, 2018, after Vontz was re-admitted to the jail, he complained of anxiety-related chest pain, and Dr. Mitcheff advised giving him two Tylenol.  (*Id.*, PageID.1008-1009).  On March 10, 2018, Jackson advised officers that Vontz needed to be placed on suicide precautions.  (*Id.*, PageID.1012).  Dr. Mitcheff ordered that Vontz be placed on 15-minute checks and that there be a follow-up by Mental Health.  (*Id.*, PageID.1013).

On March 12, 2018, Vontz was seen by Hotaling, who noted diagnoses of major depressive disorder and "irritability and anger."  Vontz told Hotaling that he was "overwhelmed" and had racing thoughts.  Hotaling discussed utilizing some "coping skills," and Vontz said he would try to use them.  (ECF No. 74-4, PageID.1039).  On April 20, 2018, Vontz was seen by Monroe Community Mental Health Authority.  (*Id.*, PageID.1034).  He reported anxiety and stress as the result of being in jail and facing prison time.  (*Id.*, PageID.1035).  He was advised to use coping skills.  (*Id.*, PageID.1038).

On March 17, 2018, Vontz made the following request regarding his

Remeron prescription:

> Please adjust my meds back its supposed (sic) to be 30 mg 2x a day and
> in the last 2 days I've been skipped doses and had it cut in half.  I need
> these meds to function properly.

(ECF No. 74-3, PageID.1026).  The notes indicate that the doctor "approved 15 mg

in am and in pm."  (*Id*.).  Notes from indicate that beginning March 19, 2018,

Vontz was prescribed 30 mg. of Remeron twice daily.  (ECF No. 75-5,

PageID.1265).  On May 17, 2018, Regina Melkonian from Monroe Community

Mental Health appeared in state court for Vontz's sentencing on one portion of the

criminal case against him.  (ECF No. 74-3, PageID.1031).

### D.    Affidavit of Dr. Mitcheff

Dr. Mitcheff is board certified in addiction medicine and family medicine

and provided care to Monroe County Jail inmates during the time relevant to this

case.  (ECF No. 74-5, PageID.1046).  He states that when Vontz was seen by a jail

nurse on March 10, 2018, he provided a history of suicide attempts and depression,

and a history of having been prescribed Remeron for depression.  (*Id*.,

PageID.1047).  Jail staff contacted Dr. Mitcheff regarding this.  (*Id.*).  Vontz was

placed on suicide watch, and Dr. Mitcheff ordered a follow-up with mental health.

(*Id*., PageID.1047-1048).

Dr. Mitcheff states that he never received any requests or kites from Vontz requesting to see a mental health provider.  (*Id*., PageID.1048).  He states that based on his review of the records, Vontz had access to mental health treatment from Monroe Community Mental Health Authority during his incarceration.  (*Id*., PageID.1048-1049).

Dr. Mitcheff states that he disagrees with Vontz's claims that he was overprescribed Remeron and that the dosage he claims to have received is not allowed by the F.D.A.  (*Id*., PageID.1049).  He states that Remeron dosages may vary according to the patient's symptoms and in accordance with the physician's judgment.  (*Id*., PageID.1051).  Dr. Mitcheff indicates that the F.D.A. only issues recommendations, not mandates, and "[p]hysicians are authorized to use alternative approaches if, in their medical judgment, they wish to do so."  (*Id*.).  He adds that in his experience, "the daily dosage of 60 mg. of Remeron which Plaintiff alleges he received is frequently used to treat patients and is not dangerous merely because it exceeds the F.D.A. recommendation of 45 mg."  (*Id*., PageID.1051-1052).  He states that factors to consider in prescribing a Remeron dosage include whether the patient was previously prescribed Remeron, whether he previously tried to harm himself or others, and whether he is having an adverse reaction to the medication.  (*Id*., PageID.1052).  Dr. Mitcheff states that all of these factors weighed in favor of prescribing a higher dosage of Remeron to Vontz.  (*Id*.).  He

notes that Vontz never complained or showed symptoms of any adverse side effects from an alleged dosage of 60 mg. (*Id*). In addition, Dr. Mitcheff states, Vontz "continuously demanded higher doses, including 60 mg. per day," and that "such actions by a patient are inconsistent with someone who is experiencing adverse side effects from a medication." (*Id*., PageID.1052-1053). Dr. Mitcheff states that Vontz "did not suffer any damages from any alleged actions or inactions by me." (*Id*., PageID.1054).

### E.   Affidavit of Jackson

Jackson was a licensed practical nurse during the relevant time in the complaint but is now a registered nurse. (ECF No. 74-6, PageID.1057). She states that she saw Vontz at the jail on March 10, 2018, during which time Vontz provided a history of suicide attempts, depression, and a history of being prescribed Remeron. (*Id*.). She notified the corrections officers and Dr. Mitcheff of Vontz's symptoms. (*Id*.). At no time during any interactions with Vontz did he complain of memory loss, delirium, impaired thinking or judgment, or any side effects from medication, nor did she perceive him to be experiencing such symptoms. (*Id*.). She did not receive any kites from Vontz requesting mental health treatment. (*Id*.).

### F.   Affidavit of Deneau

Deneau was a licensed practical nurse employed at the Monroe County Jail during the relevant time.  (ECF No. 74-7, PageID.1061).  On March 13, 2018, she documented that "Josh" with Monroe County Community Mental Health saw Vontz at the jail, that at that time Vontz was not having thoughts of harming himself, and that Dr. Mitcheff ordered that Vontz be cleared from suicide precautions and monitored as needed.  (*Id*).  Nurse Deneau was also involved in Vontz's physical examination on March 19, 2018, at which time she noted his history of high blood pressure and heart arrythmia as well as his history of severe anxiety and depression.  (*Id*.).  She documented that all of Vontz's questions were addressed and that he was told to return to the clinic as needed.  (*Id*., PageID.1061-1062).  At no time did Vontz complain to Deneau that he was experiencing memory loss, delirium, impaired thinking or judgment, or any side effects from medication, nor did she perceive him to be experiencing such symptoms.  (*Id*., PageID.1062).  Nor did she receive any requests or kites from Vontz requesting to see a mental health provider.  (*Id*.).

G.    Affidavit of Wellman

Wellman was a registered nurse employed at the Monroe County Jail during the relevant time.  (ECF No. 74-8, PageID.1066).  In response to Vontz's March 27, 2018 requests regarding a tooth ache and a blood pressure check on May 3, 2018, she advised him how to care for his dental pain and communicated with the

doctor to address the blood pressure issue. (*Id*.). When she saw Vontz on May 3, 2018, she noted that he was "alert and oriented times three," which is inconsistent with and opposite of the effects of being overmedicated. (*Id*) At no time did Vontz complain to Wellman that he was experiencing memory loss, delirium, impaired thinking or judgment, or any side effects from medication, nor did she perceive him to be experiencing such symptoms. (*Id.*). Nor did she receive any kites from Vontz requesting mental health treatment. (*Id*.).

H.     Affidavit of Bruner

Bruner was a licensed practical nurse employed at the Monroe County Jail during the relevant time. (ECF No. 74-9, PageID.1070). She checked Vontz's blood pressure three times between August 30, 2018 and October 22, 2018. On October 22, 2018, she notified the doctor of Vontz's complaints of heartburn. (*Id*) At no time did Vontz complain to Bruner that he was experiencing memory loss, delirium, impaired thinking or judgment, or any side effects from medication, nor did she perceive him to be experiencing such symptoms. (*Id.*). Nor did she receive any requests from Vontz for mental health treatment. (*Id*.).

I.     Affidavit of Julie Massengill

Julie Massengill was employed by the Monroe County Sheriff's Department as the Jail Administrator. (ECF No. 75-6, PageID.1285). She states that during the

time that Vontz was a jail inmate, health care was provided by outside contractors, including Monroe County Community Mental Health and Advanced Correctional Healthcare.  (*Id.*).  Bruner, Deneau, Jackson, Mitcheff, and Wellman were employed by Advanced Correctional Healthcare, not by Monroe County or the Sheriff's Office.  (*Id.*, PageID.1286).

### J.    Vontz's Declaration

In his Declaration submitted with his response to these motions, Vontz states that he was never consulted with medical staff before his dosage of Remeron was increased.  (ECF No. 87, PageID.1715).  He states that at one point during his incarceration he was forced to go for four days without his medication, resulting in what he believed were withdrawal symptoms, including headaches, dizziness, shakes, blurred vision, loss of appetite, and extreme fatigue.  (*Id.*, PageID.1716).

### K.    Vontz's Criminal Proceedings

Following his conviction in his criminal case, *People v. Vontz*, Monroe County Circuit Court No. 18-244318-FH,[6] Vontz moved for a new trial on the basis that as the result of being prescribed an excessive dosage of Remeron, he was

---

[6] Vontz was convicted of four counts of aggravated stalking and four counts of using a computer to commit a crime.  He was sentenced as a fourth-offense habitual offender to concurrent terms of 76 to 240 months on the aggravated stalking counts, and concurrent terms of 134 to 360 months on the use of a computer counts, with the sentences to run consecutively.  *See* ECF No. 74-2, PageID.993-1004.

not competent to stand trial.  At a post-conviction evidentiary hearing, he offered

Dr. C. Dennis Simpson as an expert witness.  Dr. Simpson testified that when the

F.D.A. approves a drug such as Remeron, it is approved "with a recommendation,

this is not a mandate, doctors get to do what they want…."  (ECF No. 74-10,

PageID.1076).  He stated that the initial recommended dose is 15 mg. per day,

which, because the patient builds up tolerance, moves up to 30 mg. and ultimately

to 45 mg.  (*Id*., PageID.1076-1077).  Dr. Simpson testified that "[p]hysicians can

use drugs as they wish in the state of Michigan."  (*Id*., PageID.1077).  Dr. Simpson

opined that if Vontz were receiving 60 mg. of Remeron daily, that dosage was

"well into the toxic level," but was not necessarily over-prescribed because

"physicians can do what they want as long as they don't address a lethal level."

(*Id*., PageID.1078).  He testified that 60 mg. per day is not a lethal level of

Remeron.  (*Id*.).  Dr. Simpson testified that in his opinion, Vontz experienced the

toxicity symptoms of Serotonin Syndrome, although he declined to make that

specific diagnosis.  (*Id*., PageID.1080).  He testified that based on published

science relative to toxic levels of Remeron, he would expect that Vontz's judgment

would be impaired.  (*Id*., PageID.1081).  Dr. Simpson further testified:

> Q:  All right, but—but people having told you that he testified, and let's
> say that he did not have slow speech, he did not have slow response, he
> was able to recall things somewhat accurately, would that change your
> opinion?

A:  If he was in fact doing that in a manner which was consistent with his previous behavior before he went on this drug, yes, it would change my opinion.

(*Id.*).  The trial court rejected Vontz's claim that he was incompetent to stand trial because of the effects of being given a 60 mg. daily dosage of Remeron and denied his motion.

The Michigan Court of Appeals affirmed Vontz's convictions.  *People v. Vontz*, Ct. App. No. 346473.  As to the dose of Remeron exceeding the F.D.A. recommendation, and Vontz's argument regarding Serotonin Syndrome, the Court of Appeals found:

> The [trial] court found it notable that defendant's dosage of Remeron during his pretrial incarceration was not technically an overdose, even if it exceeded FDA recommendations, and Dr. Simpson could not say with certainty that defendant actually suffered from Serotonin Syndrome.  Moreover, when informed that defendant testified clearly, without memory lapses, and at a normal pace at trial, Dr. Simpson agreed that those facts would change his opinion about whether defendant was suffering from Serotonin Syndrome.

(ECF No. 74-2, PageID.996).

The Court of Appeals further noted Dr. Simpson's testimony that defendant's daily dosage of Remeron was not "over-prescribed" per se, and that "if defendant was experiencing Serotonin Syndrome, defendant would 'have trouble articulating accurately from his memory' and 'thought process at the time he was speaking.' " (*Id.*, PageID.997).  Referring to the lack of medical records showing symptoms of Remeron toxicity, the Court of Appeals stated that Vontz "ignores the

fact that other symptoms—such as agitation, dizziness, or nausea—would likely be noted in medical records, yet no complaints regarding these symptoms are noted in the jail medical records." (*Id*).

### III.    Legal Standards

#### A.    Rule 12(c)

A motion for judgment on the pleadings under Rule 12(c) is subject to the same standards of review as a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. *Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir. 1998).  When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "construe the complaint in the light most favorable to plaintiff and accept all allegations as true." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (concluding that a plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action ...").  Facial plausibility is established "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S.

at 678 (citation omitted).  "The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for the defendant's conduct."  *16630 Southfield Ltd., P'Ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 503 (6th Cir. 2013).

## B.     Rule 56

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the case under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party."  *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).

"The moving party has the initial burden of proving that no genuine issue of material fact exists. . . ."  *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); cf. Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact," the court may "consider the fact undisputed for purposes of the motion").  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.' "  *Wrench LLC v. Taco Bell Corp.*, 256 F.3d

446, 453 (6th Cir. 2001) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The fact that Vontz is *pro se* does not reduce his obligations under Rule 56. Rather, "liberal treatment of pro se pleadings does not require lenient treatment of substantive law." *Durante v. Fairlane Town Ctr.*, 201 F. App'x 338, 344 (6th Cir. 2006). In addition, "[o]nce a case has progressed to the summary judgment stage, . . . 'the liberal pleading standards under *Swierkiewicz* [*v. Sorema, N.A.*, 534 U.S. 506, 512-13 (2002)] and [the Federal Rules] are inapplicable.' " *Tucker v. Union of Needletrades, Indus., & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)).

## IV.    Discussion

### A.    Physical Injury Under 42 U.S.C. § 1997e(e)

Defendants argue that Vontz's deliberate indifference claim should be dismissed because he has not established a physical injury as required under 42 U.S.C. § 1997e(e). 42 U.S.C. § 1997e(e) provides as follows:

> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18).

In *Harden-Bey v. Rutter*, 524 F.3d 789, 795-96 (6th Cir. 2008), the Sixth Circuit held that "[e]ven if we read his complaint to allege emotional or mental

injuries, [the prisoner] cannot bring an Eighth Amendment claim for such injuries because he did not allege a physical injury." (Citing § 1997e(e)).

In *King v. Zamiara*, 788 F.3d 207 (6th Cir. 2015), the Sixth Circuit held that notwithstanding the § 1997e(e) preclusion of mental or emotional claims without a prior showing of physical injury, the statute does not preclude claims for separate constitutional injuries apart from the mental or emotional injuries. "Therefore, the plain language of the statute does not bar claims for constitutional injury that do not also involve physical injury." *Id*. at 213. Specifically, *King* involved a First Amendment claim. The Sixth Circuit held as follows:

> Accordingly, we hold that § 1997e(e) does not foreclose claims that allege violations of First Amendment-protected rights as injuries. *King's claim alleges a constitutional injury distinct from any mental or emotional injury he might have suffered:* He claims that he was placed in a higher security facility for approximately ten months in retaliation for his exercise of his First Amendment rights. While at the more secure facility, King suffered infringements on his First Amendment rights because additional restrictions on his movements hindered his attempts to collect affidavits and declarations from other prisoners to assist in the *Cain* litigation. *Because King's claim is not "for mental or emotional injury," § 1997e(e) does not preclude his claim merely because he does not also claim physical injury*.

*Id*. (Emphasis added).

Here, Vontz is not bringing a First Amendment claim, nor does he seek relief for any constitutional injuries distinct from his alleged emotional injuries.[7]

---

[7] Apart from monetary damages, Vontz's complaint also asks for injunctive relief. However, since he is no longer incarcerated at the Monroe County Jail, that claim

He testified at his deposition that there were no physical injuries, and that his only claimed injuries were "mental and emotional." (ECF No. 75-2, PageID.1161).

Further, Vontz cannot now argue that he has alleged physical injury by way of the Declaration submitted with his response to this motion. In that Declaration he states that he suffered headaches, dizziness, shakes, blurred vision, loss of appetite, and extreme fatigue. (ECF No. 87, PageID.1716). In *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986), the Sixth Circuit held that "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony."

In sum, the relevant record – consisting of the medical evidence and Vontz's deposition testimony described above – shows that Vontz did not suffer a physical injury related to being prescribed Remeron. Vontz's complaint is therefore subject to dismissal under 42 U.S.C. § 1997e(e) for failure to establish, or create a genuine issue of material fact as to whether he suffered, a physical injury.

### B.     Claims against the Medical Defendants

is moot. *See Kensu v. Haight*, 87 F.3d 172, 175 (6th Cir. 1996); *see also Henderson v. Martin*, 73 Fed. Appx. 115, 117 (6th Cir. 2003) (prisoner's claim for injunctive relief against prison officials became moot when he was transferred from the prison of which he complained to a different facility).

Putting aside Vontz's failure to establish a physical injury, the Medical Defendants also argue that Vontz's deliberate indifference claim fails on the merits.  Under the Fourteenth Amendment, pretrial detainees have a due process right to medical care.  Historically, claims of deliberate indifference under the Fourteenth Amendment have been analyzed consistent with Eighth Amendment claims of plaintiffs who are serving prison sentences, in order "to avoid the anomaly of extending greater constitutional protection to a convict than to one awaiting trial." *Barber v. City of Salem, Ohio*, 953 F.2d 232, 235 (6th Cir. 1992);*see also Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018) ("This Court has historically analyzed Fourteenth Amendment pretrial detainee claims and Eighth Amendment prisoner claims 'under the same rubric.'") (quoting *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013)).

Under the Eighth Amendment approach, a deliberate indifference claim has two components, one objective and the other subjective.  *Farmer v. Brennan,* 511 U.S. 825, 834 (1994); *Comstock v. McCrary,* 273 F.3d 693, 702 (6th Cir. 2002). Under the objective component, "the plaintiff must allege that the medical need at issue is 'sufficiently serious.' " *Id.*  Under the subjective component, "the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Id.*

Recently, in *Brawner v. Scott Cnty., Tennessee*, 14 F.4th 585, 591–94 (6th Cir. 2021), the Sixth Circuit modified the test for deliberate indifference claims under the Fourteenth Amendment Due Process Clause.  The first, objective prong—that a plaintiff must show a sufficiently serious medical need—is the same as under the Eighth Amendment test.  *See Hyman v. Lewis*, __ F.4th __, 2022 WL 682543, at *2 (6th Cir. 2022) ("*Brawner* left the 'objectively serious medical need' prong untouched.").  However, *Brawner* modified the subjective prong by imposing an objective, "reasonable person" component.  *Brawner* set forth the test for the second prong as follows:

> To meet her burden to show that Nurse Massengale violated her constitutional right to adequate medical care, Brawner needed to present evidence from which a reasonable jury could find (1) that she had an objectively serious medical need; and (2) that Nurse Massengale's action (or lack of action) was intentional (not accidental) and she either (a) acted intentionally to ignore Brawner's serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to Brawner, even though a reasonable official in Nurse Massengale's position would have known that the serious medical need posed an excessive risk to Brawner's health or safety.

*Brawner*, 14 F.4th at 597.  Under the modified second prong, a plaintiff must show "more than negligence but less than subjective intent—something akin to reckless disregard."  *Id.* at 596 (citation omitted)*;see also Greene v. Crawford Cnty., Michigan*, 22 F.4th 593, 606 (6th Cir. 2022) ("*Brawner* modified the second prong

of the deliberate indifference test applied to pretrial detainees to require only

recklessness.").

The latest Sixth Circuit case interpreting *Brawner* is *Trozzi v. Lake County,*

*Ohio*, __ F.4th __, No. 21-3685 (6th Cir. March 29, 2022).  Synthesizing *Brawner*,

*Greene*, *Farmer v. Brennan*, and *Kingsley v. Hendrickson*, 576 U.S. 389 (2015),

the Sixth Circuit described the Fourteenth Amendment test as follows:

> Reading *Farmer*, *Kingsley*, *Brawner*, and *Greene* together, a plaintiff
> must satisfy three elements for an inadequate-medical-care claim under
> the Fourteenth Amendment:  (1) the plaintiff had an objectively serious
> medical need;  (2) a reasonable officer at the scene (knowing what the
> particular jail official knew at the time of the incident) would have
> understood that the detainee's medical needs subjected the detainee to
> an excessive risk of harm; and (3) the prison official knew that his
> failure to respond would pose a serious risk to the pretrial detainee and
> ignored the risk."

*Trozzi*, at p. 13.

Under the post-*Brawner* framework, the first question is whether Vontz had

a sufficiently serious medical condition.  In *Blackmore v. Kalamazoo County*, 390

F.3d 890, 897 (6th Cir. 2004), the Sixth Circuit held that "[a] medical need is

objectively serious if it is one that has been diagnosed by a physician as mandating

treatment or one that is so obvious that even a lay person would easily recognize

the necessity for a doctor's attention."  (Internal citations and quotation marks

omitted).  In this case, Vontz had been diagnosed with depression and had a history

of suicide attempts.  In *Comstock*, 273 F.3d at 703, the Court held that "a prisoner's

psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies." (Internal citations and quotation marks omitted). Vontz has satisfied the first prong of the *Brawner/Trozzi* test. [8]

As to the second prong of *Brawner* (or the second and third prongs of *Trozzi*), each defendant must be evaluated individually. *Greene*, 24 F.4th at 607 (citing *Speers v. County of Berrien*, 196 F. App'x 390, 394 (6th Cir. 2006)).

### 1.   Dr. Mitcheff

Vontz says that Dr. Mitcheff improperly prescribed a dosage of Remeron that exceeded FDA guidelines, and that Dr. Mitcheff increased the dosage to 30 mg. twice daily without personally examining or consulting with Vontz.

First, it is important to note that *Brawner* did not change the principle that mere medical negligence, or a disagreement between doctor and patient as to the course of treatment, does not equate to a constitutional violation, either under the Eighth or the Fourteenth Amendments. *Id.*, 14 F.4th at 596 (a plaintiff must show "more than negligence."); *see also Comstock*, 273 F.3d at 703 ("a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment"); *Westlake v. Lucas*, 537 F.2d 857, 860, n.5 (6th Cir. 1976) ("Where a

---

[8] That Vontz has shown an "objectively serious medical need" under *Brawner* and *Trozzi* does not negate the requirement under 42 U.S.C. § 1997e(e) that he allege a prior physical injury in order to even bring a due process claim under § 1983. As set forth above, this case could be dismissed under § 1997e(e) without addressing Vontz's underlying constitutional claim.

prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."). The facts in this case show that Vontz received treatment for his mental or emotional conditions, and that in prescribing the dosage of Remeron, Dr. Mitcheff exercised informed medical judgment.

Under *Trozzi*, the objective question in Dr. Mitcheff's case is whether a reasonable doctor, knowing what Dr. Mitcheff knew at the time, would have understood that prescribing 60 mg. per day of Remeron subjected Vontz to an excessive risk of harm. Regardless of whether he personally examined Vontz, Dr. Mitcheff knew that Vontz had been treated for depression, that he had a history of suicide attempts, and that he had previously been prescribed Remeron, albeit a lower dose. He knew that Vontz had been placed on a suicide watch. He knew that Vontz had not complained about any side effects from the medication and had in fact asked that he be provided with the higher dose of 60 mg. per day. *See* Mitcheff Affidavit (ECF No. 74-5, PageID.1052-1053).[9]

---

[9] As to this last point, Vontz sent a kite on March 17, 2018 stating, "Please adjust my meds back, its [sic] supposed to be 30 mg 2x a day and in the last 2 days I've been skipped doses and had it cut in half. I need these meds to function properly." (ECF No. 75-2, PageID.1313).

Both Dr. Mitcheff and Dr. Simpson state that the FDA recommended dosage of 45 mg. per day is not a mandate, and that physicians are permitted to exceed that dosage if, in their medical judgment, that is indicated.  Dr. Mitcheff states that factors to consider in prescribing a Remeron dosage include whether the patient was previously prescribed Remeron, whether he previously tried to harm himself or others, and whether he is having an adverse reaction to the medication.  (ECF No. 74-5, PageID.1052).  All of these factors weighed in favor of Dr. Mitcheff's decision to prescribe 60 mg. of Remeron per day, and a reasonable doctor who was aware of these facts would not have understood that prescribing that dosage would pose an excessive risk of harm to the patient.

In sum, Vontz has not shown that Dr. Mitcheff himself subjectively knew that prescribing 60 mg. per day would pose a serious medical risk and ignored the risk.  No reasonable juror could conclude otherwise based on the record. Dr. Mitcheff is therefore entitled to summary judgment on Vontz's Fourteenth Amendment deliberate indifference claim.

### 2.    Bruner, Jackson, Russeau, and Wellman

The basis of Vontz's complaint against these defendants, all of whom are nurses, appears to be that they failed to notify Dr. Mitcheff or other providers that he required some additional mental health treatment or consultation.  Again, the first question is whether a reasonable nurse who knew what these defendants knew

would have taken measures to obtain additional mental health treatment. These defendants knew, based on the medical records, that Vontz had been taken off suicide watch and was prescribed Remeron for depression. All stated in their affidavits that during their interactions with Vontz, he did not complain of memory loss, delirium, impaired thinking or judgment, or any side effects from medication, nor did they perceive him to be experiencing such symptoms. Wellman states that when she saw Vontz on May 3, 2018, she noted that he was "alert and oriented times three," which she said was inconsistent with and opposite of the effects of being overmedicated. (ECF No. 74-8, PageID.1066). All of these defendants deny receiving any kites from Vontz requesting mental health treatment. A reasonable nurse who was aware of these facts would not perceive that not requesting additional mental health treatment or consultation would pose an excessive risk of harm. Vontz has not established the "objective" portion of the *Brawner* test. For the same reasons, he has not shown that these defendants subjectively knew that their failure to request additional mental health services would pose a serious risk, and that they ignored that risk.

Therefore, Bruner, Jackson, Russeau, and Wellman are entitled to summary judgment on Vontz's Fourteenth Amendment claim.

### C.    Claims Against Malone

28

Malone argues that Vontz has not establish a viable claim against him in either his individual or official capacity.  Vontz makes two claims against Malone, who was at the relevant time the Monroe County Sheriff.  First, he alleges that "due to the policies enacted by defendant Dale Malone," he was subjected to harsh conditions while on suicide watch, including being placed in a suicide gown, being denied a mattress, and being forced to sleep on the floor in freezing temperatures. (ECF No. 86, PageID.1692-1693).  Second, Vontz alleges that Malone failed to adopt policies providing for adequate mental health care.  (*Id*., PageID.1695-1696).

Malone is named in both his individual and personal capacities.  (*Id*., PageID.1692).  Generally, a defendant in a § 1983 case cannot be held liable on a theory of *respondeat superior*.  In *Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that under § 1983, municipal liability is not unlimited, and that a municipality could not be liable on a theory of respondeat superior: "A municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."  *Id.*, at 691 (emphasis in original). Nevertheless, the *Monell* Court found that when the acts of individual employees represent the government's custom or policy, the municipality can be held liable.  *Id*., at 690–692.

However, before a court even reaches the question of municipal liability, it must first be shown that there is an underlying constitutional violation.  "If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).[10]  Therefore, Vontz's claim that Malone or Monroe County had inadequate policies regarding mental health care must be dismissed because, as discussed above, there was no underlying Fourteenth Amendment violation by any defendant.

As to the claim regarding the allegedly harsh conditions in the observation cell, those conditions as described do not make out a due process violation. Physical conditions of shelter for pretrial detainees are evaluated under the Fourteenth Amendment Due Process Clause, "which provides similar if not greater protections than the Cruel and Unusual Punishments Clause." *Spencer v. Bouchard*, 449 F.3d 721, 727 (6th Cir. 2006) (citing *Miller v. Calhoun County,* 408 F.3d 803, 812 (6th Cir.2005) and *Cnty. of Sacramento v. Lewis,* 523 U.S. 833,

---

[10] In *Brawner*, the Sixth Circuit stated that the Court had "not always been consistent discussing this issue," citing *Winkler v. Madison County*, 893 F.3d 877 (6th Cir. 2018).  *Winkler* suggested that there could be cases where an individual defendant in good faith follows a faulty policy, or where an unconstitutional act is committed by a government actor who is not a party to the case.  *Id*. at 900. Ultimately the Court found it unnecessary to decide the issue.  *Id*. at 901.  In Vontz's case, there was no constitutional violation by anyone, so *Watkins* controls.

849–50 (1998)).  In *Farmer v. Brennan,* 511 U.S. at 832, the Supreme Court held
that the Eighth Amendment "imposes duties on [prison] officials, who must
provide humane conditions of confinement; [these] officials must ensure that
inmates receive adequate food, clothing, shelter, and medical care, and must take
reasonable measures to guarantee the safety of the inmates."  (Internal punctuation
omitted).  " 'The circumstances, nature, and duration of a deprivation . . . must be
considered in determining whether a constitutional violation has occurred.' "
*Spencer*, 449 F.3d at 728.

In *Spencer*, the Sixth Circuit found an Eighth Amendment violation where
the plaintiff "lived in cold temperatures *continuously for several months* (including
all of December and January), subject only to the occasional relief of an
unseasonably warm day."  *Id*. (Emphasis in original).  The Sixth Circuit described
the other conditions in the cell as follows:

> It was particularly cold at the end of the cell block where Spencer's cell
> was located.  Although it was cold enough for the officers to wear their
> winter coats indoors, Spencer and the other inmates were dressed only
> in their standard jumpsuits.  Worse yet, whenever it rained or snowed,
> water leaked "real bad" through the ceiling above Spencer's mattress.
> The leaks caused the area where Spencer slept to be flooded.

*Id*.

In *Langford v. Bernhardt*, No. 1:08-cv-836, 2011 WL 7094573, at *3 (W.D.
Mich. Dec. 22, 2011), *report and recommendation adopted,* 2012 WL 223927
(W.D. Mich. Jan. 25, 2012), the plaintiff was housed for three months in a cell with

31

a broken window, without receiving extra blankets, subjecting him to cold temperatures.  Citing *Spencer* for the proposition that a court must consider the circumstances, nature, and duration of a deprivation, the district court declined to find an Eighth Amendment violation.

Here, Vontz was initially in the observation cell for only two days, from February 5 to February 7, 2018.  The cold air was due to a relatively small gap at the bottom of the cell door, and Vontz was at least given a five-foot square blanket. He was in the observation cell a second time for only three days.  The duration of his confinement in the allegedly cold cell was short each time, and he suffered no frostbite or other injuries.  He did not require any medical treatment.  Looking at the totality of the circumstances, his brief period of discomfort does not support a due process claim.  Being made to sleep on the floor without a mattress for this short time also falls short of a due process violation and reasonable minds could not conclude otherwise.  *See Grissom v. Davis*, 55 Fed. App'x 756, 757-58 (6th Cir., Feb. 12, 2003) (no Eighth Amendment violation where plaintiff was on "mattress restriction" for seven days, without blankets or sheets).

In sum, because no reasonable juror could find that Vontz's constitutional rights were violated, Malone, whether in his individual or official capacity, is entitled to summary judgment.[11]

### D.    Issue Preclusion

Both Malone and the Medical Defendants argue that based on the Michigan Court of Appeals decision in Vontz's criminal case, Vontz is collaterally estopped from relitigating issues in this case.  Malone argues that the doctrine of collateral estoppel bars any claim that the defendants' actions caused his criminal conviction. (ECF No. 75, PageID.1121-1122).  The Medical Defendants argue that collateral estoppel bars Vontz's claims that he was over-prescribed Remeron and that he suffered mental damages as a result.  (ECF No. 74, PageID.975-976).

Collateral estoppel, or issue preclusion, precludes the relitigation of factual or legal issues already decided in prior litigation.  *Georgia-Pac. Consumer Prod. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1098 (6th Cir. 2012).  The requirements of issue preclusion are: "(1) the precise issue must have been raised and actually litigated in the prior proceedings; (2) the determination of the issue must have been necessary to the outcome of the prior proceedings; (3) the prior

---

[11] In light of this determination, it is not necessary to address whether the Monroe County Jail had adequate policies regarding mental health treatment.  Although the undersigned notes that the record clearly shows Vontz received care for his mental health condition and there is no indication that he complained to Malone at any time about his medical care.

proceedings must have *resulted in a final judgment on the merits;* and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding." *Id*. (Emphasis in original); *see also Evans v. Pearson Enterprises, Inc.*, 434 F.3d 839, 849 (6th Cir. 2006) (describing similar requirements under Michigan law).[12]

The Court of Appeals in Vontz's criminal case was, of course, a final judgment on the merits. The issues of fact and law that were litigate and decided, and that were necessary to the outcome were as follows: (1) prescribing 60 mg. of Remeron, which exceeds the F.D.A. recommended daily dose, is not *per se* prohibited, but is entrusted to the doctor's medical judgment; (2) as a result of being prescribed 60 mg. of Remeron daily, Vontz was not rendered incompetent to stand trial; and (3) Vontz's motion for new trial was denied.

The defendants' argument that the Court of Appeals found generally that Vontz suffered no damages from the dosage of Remeron is too broad and suggests a finding not necessary to the outcome. The issue in the criminal case was not whether Vontz suffered *any* damages, but whether he suffered damages sufficient

---

[12] *Evans* noted the Michigan Supreme Court's holding that "mutuality," that is, the necessity that the prior litigation be between the same parties or their privies, is not a requirement where, as here, collateral estoppel is used defensively. *Id*., at 849, fn.4 (citing *Monat v. State Farm Ins. Co*., 469 Mich. 679, 677 N.W.2d 843, 852 (2004)).

to render him incompetent to stand trial.[13]  However, the entirety of Dr. Simpson's testimony under oath can be considered for its evidentiary value in deciding summary judgment.

Nevertheless, based on the Court of Appeals decision, Vontz is collaterally estopped from asserting that a 60 mg. daily dosage of Remeron, in excess of the F.D.A. recommended daily dosage of 45 mg., is a *per se* violation of F.D.A. regulations or that it necessarily falls outside the scope of a doctor's medical judgment.  And although it does not appear that in this case Vontz is seeking to overturn or collaterally attack his criminal conviction, such claim would also be barred by collateral estoppel.  Thus, to the extent that Vontz argues that the 60 mg. daily dosage of Remeron falls outside the scope of Mitcheff's medical judgment, his claim is barred.

## E.   Exhaustion

Finally, in a four-sentence argument, the Medical Defendants argue that Vontz has failed to exhaust administrative remedies before filing suit.  This argument could be rejected because it is well-established that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation,

---

[13]Likewise, although Malone argues to the contrary, *Heck v. Humphrey*, 512 U.S. 477 (1994), does not bar Vontz's present claims because a due process violation is distinct from the issue of competency to stand trial.  In other words, a finding in this case that there was a due process violation would not imply the invalidity of the Court of Appeals finding that he was competent to stand trial.

are deemed waived." *United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999)

(quoting *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)); *see also*

*Brindley v. McCullen*, 61 F.3d 507, 509 (6th Cir. 1995) (observing that "[w]e

consider issues not fully developed and argued to be waived.").  However, in the

interests of completeness, the undersigned will briefly consider the argument.

The Prison Litigation Reform Act ("PLRA") requires prisoners to "properly"

exhaust all "available" administrative remedies prior to filing a lawsuit challenging

prison conditions.  42 U.S.C. § 1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 88-90, 93

(2006).  Proper exhaustion of administrative remedies "means using all steps that

the agency holds out, and doing so *properly* (so that the agency addresses the

issues on the merits)."  *Woodford*, 548 U.S. at 90 (emphasis in original) (internal

quotations and citations omitted).  Requiring exhaustion allows prison officials an

opportunity to resolve disputes concerning the exercise of their responsibilities

before being sued and produces a useful administrative record.  *Jones v. Bock*, 549

U.S. 199, 204 (2007).  The PLRA does not detail what "proper exhaustion" entails

because "it is the prison's requirements, and not the PLRA, that define the

boundaries of proper exhaustion."  *Jones*, 549 U.S. at 218.  "Failure to exhaust

administrative remedies is an affirmative defense, which the defendant has the

burden to plead and prove by a preponderance of the evidence."  *Lee v. Willey*, 789

F.3d 673, 677 (6th Cir. 2015).

By Vontz's own admission, he did not exhaust his administrative remedies. However, the Medical Defendants acknowledge Vontz's claim that his grievances were " 'deleted from the system unanswered, preventing him from pursuing administrative remedies.' " (ECF No. 74, PageID.978) quoting (ECF No. 27, PageID.257)).  Under 42 U.S.C. § 1997e(a), the exhaustion requirement only mandates exhaust of *available* administrative remedies.  In the event that a plaintiff is barred from pursuing his remedies by the interference of officials, the grievance policy is unavailable and hence, exhaust is not required.  *Ross v. Blake*, 578 U.S. 632, 642–44 (2016) (Prisoner "must exhaust available remedies, but need not exhaust unavailable ones," including instances where he is prevented by interference by prison officials).  Based on defendants' cursory argument without elaboration, the undersigned cannot conclude that Vontz was required to exhaust his administrative remedies before filing suit.

Finally, as noted above, Vontz's claims against all of the moving defendants are dismissible on the merits.  Section 1997e(c)(2) provides that in the event a plaintiff "fails to state a claim upon which relief can be granted . . . the court may dismiss the underlying claim without first requiring the exhaustion of administrative remedies."  The same rule is applied where claims are dismissible on their merits based on summary judgment.  *See Bowen v. Cady*, No. 09-10414, 2010 WL 148843, at *6, n.3 (E.D. Mich. Jan. 13, 2010) (stating that "[a]lthough

[Section 1997e(c)] directly addresses a claim for relief that fails to state a claim on its face, it is equally applicable where the case has already progressed to the summary judgment stage…. [because] plaintiff's claims are without merit, the Court should grant summary judgment on the merits rather than require further exhaustion.") (citations omitted).  Overall, the Medical Defendants' argument that Vontz's complaint should be dismissed for failure to exhaust does not carry the day.

V.     Conclusion

 For the reasons stated above, it is RECOMMENDED that the Medical Defendants' and Malone's motions be GRANTED and Vontz's claims against them be DISMISSED WITH PREJUDICE.


Dated: April 6, 2022                    s/Kimberly G. Altman
Detroit, Michigan                       KIMBERLY G. ALTMAN
                                        United States Magistrate Judge


<u>**NOTICE TO PARTIES REGARDING OBJECTIONS**</u>

The parties to this action may object to and seek review of this Report and Recommendation.  Any objections must be filed within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of

appeal. *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Under Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 6, 2022.

s/Carolyn M. Ciesla
CAROLYN M. CIESLA
